Filed 11/12/25  In re S.P. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re S.P., et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. A.P., Defendant and Appellant. | G065418 (Super. Ct. Nos. 20DP0865A, 20DP0866A, 20DP0867A & 20DP0868A) O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Daphne Grace Sykes, Judge. Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

\*          \*          \*

In this dependency proceeding, A.P. (Mother) contends the juvenile court abused its discretion at the 12-month review hearing by limiting her right to make educational decisions for her then 13-year-old son, S.P., Jr. (S.P.). We disagree and affirm the court's order.[1]

## STATEMENT OF FACTS

S.P. is the oldest of four children born to Mother and S.P., Sr. (Father). The family first came to the attention of authorities in 2020, after Father stabbed Mother, and then himself, in front of the children during an episode of domestic violence. That led to Father being imprisoned for attempted murder and the children being declared dependents of the juvenile court. The children remained in Mother's care, though, and following her completion of family maintenance services, the case was closed in 2022.

Following the stabbing incident, however, S.P. began displaying explosive, threatening, and inappropriate behavior at home and school. Mother sought help for him, but treatment proved difficult because S.P. was resistant to therapy and medication. Despite being placed on numerous psychiatric holds, he remained unruly and defiant. During this time, Mother

---

[1] In addition to appealing the juvenile court's educational order in S.P.'s case, Mother filed a separate notice of appeal on the same day challenging the court's decision to continue family maintenance services in three related cases involving her other children. We processed the two notices of appeal under a single appellate case number. Because Mother's briefing addresses only the educational order, any issues arising out of the family maintenance services order are forfeited and abandoned. (See *In re Sade C.* (1996) 13 Cal.4th 952, 994.)

was engaged and cooperative with S.P.'s schooling needs, but she was having difficulty getting S.P. to attend school, and he often misbehaved there.

Eventually, the situation became too much for Mother to bear. After S.P. was released from a treatment facility in November 2023, she refused to take him back into her home for fear he would harm her or his siblings. Dependency proceedings were commenced and S.P., then age 12, was placed with his paternal grandparents. Mother opposed the placement because, among other things, she felt the grandparents were too lenient with S.P. But S.P. liked living with his grandparents, and he behaved much better in their care. He had no interest in seeing Mother, and Mother told the social worker she did not want to visit S.P. until he became stable.

At the jurisdictional hearing in January 2024, Mother pleaded no contest to allegations of failing to protect S.P. and causing him serious emotional harm. (See Welf. & Inst. Code, § 300, subds. (b)(1) & (c).)[2] The juvenile court declared S.P. a dependent of the court, ordered family reunification services, and authorized monitored visitation for Mother.

Over the following months, S.P. made considerable emotional improvement and adjusted well to living with his grandparents. Although he continued to resist attending some of his classes and did not always get along with his schoolmates, he was receiving strong staff support on his individualized educational program (IEP), and his academic performance was very good.

---

[2] All further statutory references are to the Welfare and Institutions Code.

Visitation with Mother was another matter, however. S.P. told his therapist he was afraid of Mother, disliked visiting her, and never wanted to live with her again.

For her part, Mother was making moderate progress on her case plan, which included counseling and parenting classes. But she was ambivalent about the prospect of reunifying with S.P. While she held out hope of reunifying with S.P. someday, she tended to focus on his negative behaviors and struggled to gain insight into their relationship. Following a visit with S.P. in July 2024, Mother and S.P. both reported they "needed a break from each other."

In October 2024, S.P. tried to cut himself with a pair of safety scissors at school, and suicidal drawings were found in his backpack. S.P. was reluctant to talk about the incident in therapy, but he denied having suicidal thoughts and continued to do well academically. He also generally enjoyed living with his grandparents, who had expressed interest in becoming his legal guardians.

When asked about that prospect, S.P. said he would be comfortable having the grandparents become his legal guardians, but Mother was against the idea. She told the social worker "the only benefit she could see to guardianship is the grandmother obtaining educational rights." But Mother believed "this would not be in [S.P.'s] best interest [because he] needs an educational rights holder that will hold him accountable . . . without giving in to each of his requests to avoid his outbursts."

At that time, one of the things S.P. was requesting was to terminate his IEP. Mother feared that, if the grandparents acquired S.P.'s educational rights, they would go along with that request simply to avoid

4

upsetting S.P. Mother also worried the grandparents would be less inclined to let her be involved in S.P.'s life if they became his legal guardians.

As it turned out, the grandparents ultimately decided not to pursue a legal guardianship over S.P. because of the impact it would have on his services. However, the grandparents made clear they were willing to keep S.P. in their home and care for him as long as needed, and S.P.'s service providers were generally on board with this placement plan. S.P.'s therapist did have some concerns about how the grandmother communicated with S.P., noting she could come off as insensitive at times. Overall, though, there was never any question the grandparents were providing S.P. with loving care, and he had "stabilized significantly" while living in their home.

As the 12-month review hearing approached, however, S.P. began having issues at school with attendance and assignments in some of his IEP classes. Fearing S.P.'s grades were starting to slide, the grandparents told the social worker it would be helpful for them to acquire S.P.'s education rights, because it would streamline their ability to get information about S.P. and make educational decisions on his behalf. It also would allow them to make those decisions without having to interact with Mother, with whom they have a strained relationship and sometimes have difficulty communicating.

In seeking S.P.'s educational rights, the grandparents assured the social worker they would not remove S.P. from his IEP simply to appease him. But to alleviate some of the problems S.P. was having at school, the grandparents did want to change two of his IEP classes to another teacher. The grandparents reported they had a meeting scheduled with school officials later that week to discuss that issue and how best to support S.P. in his academic endeavors.

These developments coincided with the 12-month review hearing, which was held on April 3, 2025. At the hearing, the juvenile court terminated Mother's reunification services, but it did not schedule a permanent placement hearing because neither adoption nor legal guardianship was an available option for S.P. Instead, the court ordered S.P. to remain in foster care with his grandparents as his long-term placement plan. None of the parties objected to that aspect of the court's ruling.

They did disagree, however, on who should have the right to make educational decisions on S.P.'s behalf. S.P.'s attorney argued such rights should go to the grandparents, because they are best equipped to help S.P. overcome the issues he was currently having at school. In that regard, counsel argued "the grandparents are really the ones who are seeing [S.P.] every day when he comes home [from school], helping him with his [schoolwork] and are more in the loop with what's going on. The grand[mother] stated that the school calls them when something happens when he's truant or missing school. [¶] So she would like to have some power to actually partake in these decisions since they're the ones kind of dealing with the consequences. [S.P.] stated he feels that [Mother] doesn't know what's happening day-to-day with his teachers and staff, in part due to him not really talking to [Mother], quite frankly. But nonetheless, that's the reality of their situation right now."

Father's counsel shared these sentiments. He told the court, "There have been some behavior issues" at school, but grandmother "is not allowed to sign anything that needs to be signed, and she's not allowed to intervene in a way that she feels . . . she probably should if she is providing permanency for [S.P.]."

6

Mother's counsel recognized Mother and S.P. have a strained relationship but asserted that has not prevented Mother from being involved in S.P.'s educational decisions. Counsel argued S.P. would benefit from having Mother remain involved in those decisions because she raised S.P. and is familiar with his special needs.

Counsel for respondent Orange County Social Services Agency submitted on the issue without taking a position.

After finding S.P.'s educational needs were currently being met, the juvenile court limited Mother's right to make educational decisions for him and appointed the grandparents to serve as S.P.'s educational rights holders. The court found the appointment was in S.P.'s bests interests and also made sense from a practical perspective, given the grandparents are S.P.'s sole caretakers at this time.

## DISCUSSION

Mother contends the juvenile court erred in limiting her right to make educational decisions on S.P.'s behalf. We disagree.

### I.

### APPLICABLE LAW AND STANDARD OF REVIEW

"Parents have a constitutionally protected liberty interest in directing their children's education. [Citations.] However, when a child is a dependent child, a court may limit a parent's ability to make educational decisions on the child's behalf by appointing a responsible adult to make educational decisions." (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1276; § 361, subd. (a)(1).) Any such limitation must be based on the best interests of the child and may not exceed what is necessary to protect the child. (§ 361, subds. (a)(1) & (6).)

We review an order limiting a parent's educational rights for abuse of discretion, "bearing in mind '[t]he focus of dependency proceedings is on the child, not the parent.'" (*In re R.W., supra*, 172 Cal.App.4th at p. 1277.) Under that standard, we may not substitute our decision for that of the juvenile court and may reverse only if the court's order exceeds the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

## II.

## ANALYSIS

Mother contends the court's educational order was based on "mere convenience in administering [S.P.'s] school issues . . . without a showing of compelling need related to the child's best interests." She offers five specific reasons why, in her view, the order was improper.

First, Mother faults the juvenile court for not taking any testimony on the educational rights issue. She contends this is problematic because the only information the court received on the issue came from the attorneys' representations and arguments. That is simply not true. At the hearing, the court admitted several of the social worker's reports into evidence, including the two most recent reports from the spring of 2025. Although Mother ignores those reports in her briefing, they contain pertinent information on S.P.'s school performance and why the grandparents were

seeking the authority to make educational decisions on his behalf. This provided a sufficient evidentiary basis for the court's ruling.[3]

Second, and relatedly, Mother contends the record is vague as to what kind of "'issues'" the attorneys were alluding to when they claimed S.P. was having trouble at school. But, according to the social worker's reports, S.P. was having trouble keeping up his attendance and staying on top of his assignments in some of his IEP classes. The reports even mention the specific classes and teachers S.P. was having difficulties with. This belies Mother's assertion there is "no real evidence" as to what issues S.P. was facing at school and why a change in his educational rights holder was needed.

Third, Mother contends the order limiting her educational rights was unnecessary because S.P. is a good student. But that was not always the case. In fact, when S.P. was living with Mother, his school attendance was spotty and characterized by explosive and oppositional behavior. Although Mother was participating in S.P.'s educational decisions at that time, she was not providing him with the emotional and psychological support needed for him to succeed in school.

At the time of the 12-month review hearing, S.P. was still having issues at school, which is why the grandparents sought to become his educational rights holder. Mother questions whether there are any educational decisions left for the grandparents to make at this point, given

_____

[3] It is also worth noting Mother never requested to put on any testimony at the hearing. Having failed to do so, Mother is no position to criticize the juvenile court for not taking any additional evidence before limiting her educational rights. (See *In re Dakota H.* (2005) 132 Cal.App.4th 212, 221–222 [the forfeiture rule prevents a party from standing by silently until the conclusion of the trial court proceedings and then attempting to challenge an aspect of those proceedings on appeal].)

their commitment to keeping S.P. in his IEP. But the record shows there are issues *within* that program—regarding teachers, classes, and assignments—the grandparents have been trying to address with the staff at S.P.'s school. So, even if S.P. remains in his IEP, the grandparents will still have to make important educational decisions on his behalf.

Fourth, Mother contends that, rather than excluding her from the decision-making process, the court should have fashioned a remedy whereby she could still have input in the decisions affecting S.P.'s education, such as making her and the grandparents coholders of S.P.'s educational rights. But the record shows Mother has a fractured relationship with the grandparents and an even more damaged relationship with S.P.

Indeed, S.P. has made clear he wants nothing to do with Mother. Although a child's preferences are not determinative of his best interests, they are "powerful demonstrative evidence" of such. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432; *In re Michael D.* (1996) 51 Cal.App.4th 1074, 1087.) And, irrespective of S.P.'s feelings toward Mother, the juvenile court reasonably inferred their troubled relationship would impair her ability to make fully informed decisions regarding his education. (See *In re Samuel G.* (2009) 174 Cal.App.4th 502, 510–511 [the educational rights holder must meet with the child as often as necessary to acquire the information needed to make well-informed decisions on his behalf].)

Mother's fifth and final argument is that the juvenile court failed to state a sufficient factual basis for its order limiting her educational rights. After hearing extensive arguments from counsel on that issue, however, the court found it was in S.P.'s best interest to appoint the grandparents as his educational rights holder. The court also determined that appointment made the most practical sense, in light of the fact the grandparents are S.P.'s sole

10

caretakers. This was sufficient to inform Mother of the basis for the court's decision, which is all the law requires. (See Cal. Rules of Court, rule 5.651(b)(2)(H)(ii).)

We understand Mother's desire to remain involved in her son's educational decisions. However, based on the factual circumstances of the case, and for the reasons discussed above, the juvenile court did not abuse its discretion in limiting her educational rights over S.P.

## DISPOSITION

The juvenile court's order limiting Mother's right to make educational decisions for S.P. is affirmed.



GOODING, J.

WE CONCUR:


MOORE, ACTING P. J.


SCOTT, J.

11